[Cite as *Meyer v. Dayton*, 2016-Ohio-8080.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | |
|---|---|
| SANDRA K. MEYER | : |
| | :    Appellate Case No. 27002 |
| Plaintiff-Appellant | : |
| | :    Trial Court Case No. 14-CV-3714 |
| v. | : |
| | :    (Civil Appeal from |
| CITY OF DAYTON, OHIO, et al. | :     Common Pleas Court) |
| | : |
| Defendants-Appellees | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of December, 2016.

. . . . . . . . . . .

JAMES R. GALLAGHER, Atty. Reg. No. 0025658, Gallagher, Gams, Pryor, Tallan & Littrell, L.L.P., 471 East Broad Street, 19th Floor, Columbus, Ohio 43215-3872
      Attorney for Plaintiff-Appellant

LAWRENCE E. BARBIERE, Atty. Reg. No. 0027106, ROBERT S. HILLER, Atty. Reg. No. 0027109, and JAY D. PATTON, Atty. Reg. No. 0068188, Schroeder, Maundrell, Barbiere & Powers, 5300 Socialville Foster Road, Suite 200, Mason, Ohio 45040
and
JOHN C. MUSTO, Atty. Reg. No. 0071512, 101 West Third Street, Post Office Box 22, Dayton, Ohio 45401

      Attorneys for Defendants-Appellees, City of Dayton and City of Dayton, Ohio
          Department of Aviation d.b.a. James M. Cox International Airport.

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Sandra Meyer appeals from the trial court's entry of summary judgment for the City of Dayton and the City of Dayton, Ohio Department of Aviation, d.b.a. James M. Cox Dayton International Airport, on her claim of negligence for injuries she sustained when she fell in an airport parking lot. Finding no error, we affirm.

## I. Background

{¶ 2} On a February 2014 morning Meyer arrived at the Dayton International Airport to catch a morning flight to Chicago. She parked in the blue lot, a long-term outdoor parking lot. Meyer had intended to park in the parking garage, but she had missed the turn, was running late, and was worried that she would miss her flight. Although she had flown out of the airport before, this was the first time that she had parked in the blue lot. The closest parking-area marker that she saw read F1.

{¶ 3} Three days later, on February 22, Meyer returned to Dayton. By the time she exited the terminal, it was dark outside. She walked through the parking garage and straight into the blue lot. Meyer pushed a four-wheel suitcase with her right hand, had a computer bag slung over her right shoulder, and carried a cup of airport coffee in her left hand. She had trouble seeing because several lights in that area of the parking lot were not lit. As Meyer walked down the row looking around for her car, the suitcase that she was pushing abruptly stopped, causing her to pitch forward and land on the asphalt. She fell on her left side, and her left leg fell across what she described as a "crack," (Meyer Dep. 67), or "rut," (*id.* at 91), in the asphalt where one side was higher than the other, breaking the leg just below the hip. She managed to crawl to her computer bag, retrieve her phone, and call 911. Dayton Police Officer Matthew Lykins was the first to arrive and

found Meyer laying in row F1. Airport fire department paramedic James Fannin arrived soon after. He stabilized Meyer and then transported her to Miami Valley Hospital.

{¶ 4} At the time of Meyer's fall, Donald Fraley was the Operations and Maintenance Manager at the Dayton Airport. On the day after the fall, after seeing a report or log indicating that there had been an injury in the blue long-term lot, he went out to the lot, "in the general location where she fell." (Fraley Dep. 56). He observed "about a one-inch lip" extending from the area of row G1 to a couple rows past row F1 "where two separate areas of asphalt were done at different periods of time." (*Id.* at 51). Although Fraley did not measure the lip, when asked if he thought that it was a "hazard" he responded "not a one inch–not a one-inch lip." (*Id.* at 58). In his affidavit, Fraley states that before February 22, 2014, he was not aware of any hazardous condition in the area where Meyer fell; was not aware of any lights being out in the area; and was not aware of any slips, trips, or falls in the area. He also states that after learning of Meyer's fall he went out to the "alleged area where the plaintiff fell" and he "did not observe any hazard in the alleged area of Plaintiff's fall." (Fraley Affidavit ¶ 9).

{¶ 5} About a month after Meyer's accident, Bruce Bales, the chief of the airport fire department, asked Fannin to show him where Meyer had fallen. The two men drove to the parking lot, and Fannin pointed to the area in which he believed Meyer had fallen. Bales saw a crack in the asphalt where there was a difference elevation. Having no measuring device with him, Bales photographed his pocketknife leaning against the base of the drop. The knife is approximately 1 3/8 inches wide, and from the photos, the difference in elevation appears to be two inches or less. After seeing Bales's photos near the end of March 2014, the airport's deputy director ordered that the asphalt in that area

be repaired. The repairs were made the following October.

{¶ 6} On June 25, 2014, Meyer sued the City of Dayton and the Dayton Department of Aviation d.b.a. James M. Cox Dayton International Airport (which we will refer to collectively as "Dayton") for negligence.[1] Dayton moved for summary judgment on the grounds that the facts were insufficient to demonstrate that Dayton had a duty to Meyer, that she is unable to describe the cause of her fall, and that in this circumstance Dayton is immune from liability. Later, Dayton moved to strike inadmissible evidence cited by Meyer in her memorandum opposing summary judgment, and to strike Meyer's supplemental memorandum in opposition. On January 20, 2016, the trial court overruled both of Dayton's motions to strike, but sustained its motion for summary judgment.

{¶ 7} Meyer appealed.

## II. Analysis

{¶ 8} Meyer's sole assignment of error alleges that the trial court erred by entering summary judgment for Dayton. Under Civ.R. 56, "summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor." (Citation omitted.) *Armstrong v. Best Buy Co.,* 99 Ohio St.3d 79, 2003-Ohio-2573, 788 N.E.2d 1088, ¶ 15. "We review summary judgment decisions de novo, which means that we apply the same standards as the trial

---

[1] The complaint also lists Dayton Airport Parking, LLC, as a defendant, but Dayton Airport Parking was dismissed without prejudice. Meyer also filed two amended complaints that added as defendants Reese Electric, Inc., Rusty Reese, and Sunesis Construction Company. Meyer later voluntarily dismissed her claims against these defendants.

court." (Citations omitted.) *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.).

{¶ 9} "In order to establish actionable negligence, a plaintiff must demonstrate the existence of a duty, a breach of the duty, and an injury proximately resulting from the breach." (Citations omitted.) *Dalzell v. Rudy Mosketti, L.L.C.*, 2d Dist. Clark No. 2015-CA-93, 2016-Ohio-3197, ¶ 8, citing *Menifee v. Ohio Welding Prod., Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). "Thus, the existence of a duty is fundamental to establishing actionable negligence. '* * * If there is no duty, then no legal liability can arise on account of negligence. Where there is no obligation of care or caution, there can be no actionable negligence.' " *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142, 539 N.E.2d 614 (1989), quoting 70 Ohio Jurisprudence 3d, Negligence, Section 13, at 53-54 (1986). Here, Dayton moved for summary judgment in part on the grounds that Meyer cannot prove that it owed her a duty of care and in part on the grounds that she cannot specifically identify what it was that caused her to fall. Dayton also contended that it is immune under R.C. 2744.

*The duty of care*

{¶ 10} When she entered the parking lot, Meyer was a business invitee. *See Light v. Ohio University*, 28 Ohio St.3d 66, 68, 502 N.E.2d 611 (1986) ("Business invitees are persons who come upon the premises of another, by invitation, express or implied, for some purpose which is beneficial to the owner."). "Business owners owe business invitees a duty of ordinary care in maintaining the premises in a reasonably safe condition so as not to unnecessarily and unreasonably expose invitees to danger. However, business owners are not insurers of an invitee's safety or against all forms of accidents that may occur. 'No presumption or inference of negligence arises from the mere

occurrence of an accident or from the mere fact that an injury occurred.' " (Citations omitted.) *Watkins v. Scioto Downs, Inc.*, 10th Dist. Franklin No. 15AP-985, 2016-Ohio-3141, ¶ 9, quoting *Byrd v. Arbors E. Subacute & Rehab. Ctr.*, 10th Dist. No. 14AP-232, 2014-Ohio-3935, ¶ 9; *see also Paschal v. Rite Aid Pharmacy, Inc.*, 18 Ohio St.3d 203, 480 N.E.2d 474 (1985).

{¶ 11} Some premises conditions are not dangerous as a matter of law. "[M]unicipalities and private landowners are generally not liable as a matter of law for minor defects in sidewalks and other walkways; such defects are commonly encountered, and courts have taken the view that pedestrians should expect such minor variations." *Long v. Speedway, L.L.C.*, 2d Dist. Montgomery No. 26851, 2016-Ohio-3358, ¶ 9. Under the "two-inch" rule, established by the Ohio Supreme Court in *Cash v. Cincinnati*, 66 Ohio St.2d 319, 421 N.E.2d 1275 (1981), a rebuttable presumption exists that "a difference in elevation between adjoining portions of a sidewalk or walkway that is two inches or less in height is insubstantial." (Citation omitted.) *Long* at ¶ 9. To rebut this presumption, it must be shown that attendant circumstances existed that rendered the difference in elevation substantial. *Cash*; *Long* at ¶ 9; *Sexton v. Certified Oil Co.*, 4th Dist. Ross No. 11CA3299, 2013-Ohio-482, ¶ 17.

{¶ 12} Here, the condition that allegedly caused Meyer to fall is the drop in asphalt elevation shown in Bruce Bales's photographs (attached to his affidavit). The photos show Bales's pocketknife, measuring a little less than 1 3/8 inches, (Bales Dep. 26), leaning against the base of the drop. The trial court concluded based on these photos that there is no genuine issue of material fact that the change in elevation was less than two inches. Applying the two-inch rule, the court concluded that the elevation change is insubstantial

as a matter of law. Meyer argues that it is unreasonable to conclude that the change in elevation is less than two inches based solely on the photos. We agree with the trial court that there is no question that at the spot where Bales photographed his knife the difference in elevation is two inches or less. But this conclusion is irrelevant because the record definitively demonstrates that the area shown in Bales's photos is not where Meyer fell.

{¶ 13} At her deposition Meyer was presented with an aerial photograph of the parking lot (Defendant's Exhibit 3, attached to Meyer's deposition). The lot sits adjacent to a parking garage. Running perpendicular to the sidewalk along the front of the garage, double rows of parking spaces alternate with driving lanes. Some of the double rows have a tall post at their head bearing a parking-area marker. Because not every double row has a marker, several driving lanes are included in each marked area. On the aerial photo, Meyer circled the approximate spot that she parked. Looking out at the parking lot from the parking garage, the spot is one row to the south of the double row headed by the parking-area post marker for F1.[2] Meyer marked an "x" on the photo at the approximate location of her fall. The place that she marked is in the first driving lane that runs along the north side of the marker post for row F1, which is the row that Officer Lykins said he found Meyer, (Lykins Dep. 20; Defendant's Exhibit 12).

{¶ 14} But Bales took his photos in the driving lane that is one lane farther to the

---

[2] Also at her deposition Meyer was asked about Defendant's Exhibit 2, a "Blue Lot Reconstruction" diagram on which someone had handwritten "F1" and several other parking lane numbers. The location of the F1 lane marked on this diagram is inconsistent with the location of the lane given in other evidence we reference. The record does not indicate who marked the diagram or how this inconsistency came about.

north of the lane in which Meyer said that she fell. The F1 marker is visible in some of Bales's photos, and the marker's apparent location conclusively shows that the photos were not taken in the lane that runs along the north side of the double row headed by the F1 marker. Also, Fannin admitted in his deposition that he might have led Bales to the wrong lane. When asked whether the photos show the area in which he found Meyer, Fannin replied:

A. I can't recall that. I just remember, what I was judging off of and where I took him [Bales] was the distance from this building from when we arrived. (Indicating.) So I said this general area and I think he was going off my report where I said she had fallen off or stepped off uneven pavement. I think he noticed this and said this must be where she was referring to.

* * *

A. * * * We may even be in the wrong lane. Like where this says C1, this may be C2 or C3 and she may have been in C5. I can't remember.

Q. You don't remember either way?

A. No. * * *

(Fannin Dep. 31-32). The trial court recognized the possibility that the area photographed by Bales was not where Meyer fell: "Although the alleged place where Plaintiff fell was documented through pictures, it is not confirmed by the Plaintiff that this was the exact place where she fell." *Decision, Order and Entry Sustaining Defendant City of Dayton, Ohio, et al.'s, Motion for Summary Judgment* (January 20, 2016).

{¶ 15} Three photographs in the record (Defendant's Exhibits 5, 6, 7, attached to Meyer's deposition) confirm the court's suspicion. These photos were apparently taken

at the scene on the night of the accident and show the area of the fall. In two of the photos part of an ambulance can be seen in the background, and in the third photo there is what appears to be a coffee cup laying on the ground. Meyer testified that she had been carrying a cup of coffee when she fell, and Officer Lykins wrote in his report that "[a] coffee cup was located near Ms. Meyer and was warm to the touch." (Defendant's Exhibit 12). The electronically filed copies of these deposition photos, when downloaded as a PDF document, are in color, though the print copies in our record are black and white. The photos show that the asphalt in the area was in rough shape—a web of cracks. Officer Lykins wrote in his report that "the pavement does have a uniform drop in elevation of approx. 1 inch at the point near the alleged fall." (Defendant's Exhibit 12). But Lykins admitted that he did not measure the drop and saw it only in the dark. While the photos themselves contain no indication of which lane they were taken in, there is no question that the pattern of cracks in the asphalt does not match the pattern of asphalt cracks shown in Bales's photos.

{¶ 16} The trial court concluded that the difference in elevation of the asphalt described by Bales and shown in his photos is insubstantial as a matter of law. Our de novo review leads us to conclude that Bales photographed the wrong location, so summary judgment should not be granted based on the nature of the condition at that specific location. But summary judgment could be granted based on the nature of the condition in the area where Meyer actually fell.

{¶ 17} At his deposition Fraley was asked about, and shown, the three photos taken by Bales, and Fraley testified that it was his understanding that these photos show the area where Meyer fell. But Fraley's initial first-hand, next-day observation of the

location where the fall actually occurred was not limited to the aisle shown in Bales's photos. Fraley said that he went out to the area around the F1 light pole and observed the "lip" that extended over several aisles but did not see a "hazard." (Fraley Dep. 57). He examined the "whole area" enough to get a look at the lip. (*Id.* at 91). Fraley was also asked about the three night-time photos taken in the actual aisle in which Meyer fell. He said that these photos were taken by Chris Pearson, a supervisor working in his department, and said that Pearson took the pictures on the night of the fall to record the area around where Meyer fell. (*Id.* at 124-126).

{¶ 18} There is no genuine issue as to the elevation difference in the actual area of her fall. Faley's affidavit and deposition, the photos of the area, and Officer Lykins's testimony are the only evidence about the elevation difference, and all suggest that the difference was well under two inches. Applying the two-inch rule, therefore, this condition too is insubstantial as a matter of law.

{¶ 19} Our determination that the elevation difference was less than two inches does not end the inquiry. In *Cash*, the Ohio Supreme Court said that this finding only raises a rebuttable presumption that the defect is insubstantial. Attendant circumstances can rebut the presumption. Attendant circumstances include "any distraction that would come to the attention of the pedestrian in the same circumstances and reduce the degree of care an ordinary person would exercise at the time." (Citation omitted.) *Henry v. Marriott Hotel Serv., Inc.*, 2d Dist. Montgomery No. 19653, 2003-Ohio-4840, ¶ 8. But they do not include regularly encountered, ordinary, or common circumstances, *Colville v. Meijer Stores Ltd. Partnership*, 2d Dist. Miami No. 2011-CA-011, 2012-Ohio-2413, ¶ 30, citing *Cooper v. Meijer*, 10th Dist. Franklin No. 07AP-201, 2007-Ohio-6086, ¶ 17, at least in the

parallel open-and-obvious analysis of attendant circumstances. Also in that analysis, "[a]ttendant circumstances do not include the individual's activity at the time of the fall unless the individual's attention was diverted by an unusual circumstance of the property owner's making." *McConnell v. Margello*, 10th Dist. Franklin No. 06AP-1235, 2007-Ohio-4860, ¶ 17.

{¶ 20} Meyer argues that there is a genuine issue of fact as to whether there were attendant circumstances. She refers to 11 conditions as attendant circumstances which can be summarized as the following: her unfamiliarity with the parking lot, the darkness, the direction of the black asphalt elevation change, the late hour, the weather, and Dayton's knowledge of the elevation differential. That Meyer was unfamiliar with the parking lot or that the weather when she parked was different than the weather when she returned or that the hour was late are not attendant circumstances, because they are not distractions that would reduce the degree of care exercised by a pedestrian or because they are not circumstances of the property owner's making or under the property owner's control. Likewise we fail to see how the direction of the elevation change or darkness of the pavement reduces the care exercised by pedestrians. That leaves only Dayton's knowledge of the elevation difference and the lighting as potential attendant circumstances. In regard to what Dayton knew, we conclude that does not make an otherwise minor defect into a dangerous condition. As to the lack of light, we held in *Russell v. Creatif' Catering, Inc.*, 2d Dist. Montgomery No. 17031, 1998 WL 833811, *3 (Dec. 4, 1998), that in the absence of other circumstances, dim lighting alone does not amount to an attendant circumstance. We distinguished *Russell* in *Goldshot v. Romano's Macaroni Grill*, 2d Dist. Montgomery No. 19023, 2002-Ohio-2159, based on the fact that,

in *Goldshot*, dim lighting was not the only circumstance. There was also evidence that the property owner knew that others had fallen at the same location. The present case is distinguishable from *Goldshot* because, while Dayton might have known about the elevation difference in the area where Meyer fell, we see nothing in the record suggesting that anyone has ever fallen there. For these reasons, we conclude that there is no genuine issue of material fact as to the existence of attendant circumstances. The evidence shows no attendant circumstances existed that would make the insubstantial asphalt defect substantial.

{¶ 21} Assuming that a difference in the elevation of the asphalt caused Meyer's fall, negligence cannot be found, because Dayton had no duty to her vis-à-vis that condition.

*Other issues related to the duty of care*

{¶ 22} It is possible that the condition that caused Meyer to fall is open and obvious, which would also relieve Dayton of any duty of care to Meyer, *see Lang v. Holly Hill Motel, Inc.*, 122 Ohio St.3d 120, 2009-Ohio-2495, 909 N.E.2d 120, ¶ 11 (saying that "when a plaintiff is injured by an open and obvious danger, summary judgment is generally appropriate because the duty of care necessary to establish negligence does not exist as a matter of law"). But Dayton did not argue the open-and-obvious issue in its summary-judgment motion, the trial court did not consider the issue, and neither party argues the issue in their briefs. Therefore we do not consider it.

{¶ 23} Meyer argues throughout her brief that Dayton's liability may be premised on the failure to fix the lights in the area in which she fell. Evidently, several lights were not working that night because they had shorted out. But darkness generally cannot be a

basis of liability, because the owner of a parking lot has no obligation to light it. *Jeswald v. Hutt*, 15 Ohio St.2d 224, 227, 239 N.E.2d 37 (1968). "Not only is there no duty to light a parking lot there is no precedent that once some light is provided, the owner of the premises has a duty to provide 'adequate' lighting." (Citation omitted.) *Meilink v. AAA Northwest Ohio*, 6th Dist. Lucas No. L-98-1139, 1998 WL 833570, *2 (Dec. 4, 1998). Because Dayton had no duty to light the parking lot, it cannot be negligent for not fixing the lights.

*The particular cause of Meyer's fall*

{¶ 24} Ultimately, the trial court concluded that negligence could not be found because Meyer could not clearly identify where she fell or what caused her to fall. It is true that " '[t]he fact that a pedestrian cannot identify an unseen hazard as the cause of injury does not entitle the defendant to summary judgment.' " *Baker v. Bob Evans Farms, Inc.*, 9th Dist. Wayne No. 13CA0023, 2014-Ohio-2850, ¶ 20, quoting *Lovejoy v. EMH Regional Med. Ctr.*, 9th Dist. Lorain No. 07CA009145, 2008-Ohio-3205, ¶ 12. But "[t]he mere happening of an accident gives rise to no presumption of negligence." *Parras v. Std. Oil Co.*, 160 Ohio St. 315, 319, 116 N.E.2d 300 (1953). " 'Negligence is a fact that will not be presumed * * *.' " *McLain v. Equitable Life Assur. Co. of U.S.*, 1st Dist. Hamilton No. C-950048, 1996 WL 107513, *6 (Mar. 13, 1996), quoting *Wesly v. The McAlpin Company*, 1st Dist. Hamilton No. C-930286, 1994 WL 201825, *2 (May 25, 1994). " 'An inference of negligence does not arise from mere guess, speculation, or wishful thinking, but rather can arise only upon proof of some fact from which such inference can reasonably be drawn.' " *Gibbs v. Speedway, LLC*, 2014-Ohio-3055, 15 N.E.3d 444, ¶ 19 (2d Dist.), quoting *Parras* at paragraph two of the syllabus; see also *Parras* at 319 (saying that "in

order for an inference to arise as to negligence of a party, there must be direct proof of a fact from which the inference can reasonably be drawn"). Consequently, " '[w]hen the cause of a fall cannot be identified, a finding of negligence is precluded.' " *Hill v. Monday Villas Property Owners Assn.*, 2d Dist. Montgomery No. 24714, 2012-Ohio-836, ¶ 18, quoting *Russell*, 1998 WL 833811, at *2.

{¶ 25} At her deposition Meyer tried to explain what happened. She said that while she was walking in the parking lot, pushing her wheeled suitcase and looking for her car, one of the suitcase wheels caught in a divot or rut in the asphalt. This caused the suitcase to stop abruptly, which caused her to pitch forward onto the ground:

Q. * * * [Y]ou said that your bag, as you were walking, suddenly stopped, correct?

A. Correct.

Q. And where did the bag go?

A. It went forward. It tilted forward.

* * *

Q. So then for the bag to tilt forward, was it because you started to fall and you held on to it or did the bag stop and then tilt forward for some other reason?

A. What I remember is falling forward, falling. * * *

* * *

Q. So the bag went forward, and you went forward as well?

A. Yes.

* * *

Q. Did you fall onto or over the bag before you made it to the asphalt surface?

A. I did not fall on the bag.

(Meyer Dep. 80-83).

{¶ 26} But Meyer could not say what, exactly, it was that caused her suitcase to stop so abruptly:

Q. So do you know what caused your suitcase to stop?

A. My suitcase stopped because it hit a rut and went down in and stopped.

Q. Did you ever see that rut either before or after you fell?

A. Before, no, After, I was in it. That's what I was.

Q. I want to know what you saw or didn't see. Did you ever see the rut that your suitcase stopped?

A. No.

Q. So you can't describe this rut in any way?

A. I can describe it in that I fell so that my femur hit the edge of it and sheared it.

Q. When you say "rut," what do you mean?

A. There was an edge. There was a definite edge that I—because when I turned myself around to move out of it, I had to move out of it, so there was an edge to it.

* * *

Q. So I know I told you not to do this, but when you say there was an edge,

you mean you have your surface, there's surface at one level and then, adjacent to it, there's a surface at a different level? Is that what you mean by "edge," the difference in those two levels?

A. That is the one that my leg hit. What was over here, there was a rut, so whether one side was higher than the other, I don't know. I just know there was a rut that my wheels got stuck in, and I went down like this.

Q. * * * Before, when I held my hands up, and held my fingers up, if you will, at one level and my other hand at a different level, are you saying that's the situation that created the edge, that there were two levels of asphalt, one higher than the other?

A. I don't know.

Q. So, again, are you able to describe the rut that caused your wheel or wheels to stop?

A. No.

(*Id.* at 91-94).

{¶ 27} In the record are several accounts of the fall that differ from Meyer's depositional account. The first is in the recording of her 911 call. Meyer told the dispatcher, " 'I was wheeling my bag in the parking lot and there's a big divot and I didn't see it and my ankle twisted and I went down.' " *Plaintiff's Memorandum Contra Defendant's Motion for Summary Judgment*, 4. The other accounts come from the reports of emergency responders. Officer Lykins wrote in his report that

Ms. Meyer advised that she had been travelling (sic) thru the parking lot heading toward her vehicle. Ms. Meyer advises, that as she was walking

that the pavement dropped causing her to fall. Ms. Meyer advised that after stepping onto the lower pavement that her roller board which she was pulling behind her dropped down causing her to lose her balance. Ms. Meyer advised severe pain in her left leg and stated that she felt it was broken.

(Defendant's Exhibit 12; Lykins Dep. 21). When Meyer was asked at her deposition about Officer Lykins's report, she said that she did not remember saying this. She also noted that she was not pulling the suitcase but pushing it. James Fannin, the paramedic who treated Meyer at the scene, wrote in his report that Meyer "stated she 'was walking to her car after her flight rolling her luggage when she stepped into a pothole in the parking lot; due to the lighting in the parking lot, she was unable to see the hole. She started to fall and the wheels on her luggage tripped her feet and she fell onto her butt and felt a pop in her thigh.' " (Defendant's Exhibit 11). When asked about Fannin's report, Meyer said that she did not remember what she told him. She denied stepping into a pothole. When she was asked whether the suitcase wheels tripped her, she said, "In a split second, my luggage stopped. It was locked. It pulled me forward. Whether or not my feet were involved or not, I don't remember." (Meyer Dep. 99). A Dayton Fire Department paramedic wrote in a report that Meyer "states she was walking to her car with her rolling suitcase and s[t]epped on uneven pavement and felt a 'pop' and excruciating pain in her right (sic) leg." (Defendant's Exhibit 12). Lastly, a medical record from the Miami Valley Hospital says that Meyer "went into a pothole and she tripped over the suitcase, and she said she literally flew over her suitcase into the left upper leg." (Defendant's Exhibit 13). Asked about the hospital record, Meyer said that it is simply wrong. She explained, "These are

words of a woman who is in shock." (Meyer Dep. 105).

{¶ 28} The variations in the accounts that Meyer gave of how she fell show that she was unsure about the exact cause of her fall. Dayton argues that these non-depositional accounts should not be considered because they are hearsay.[3] But not even at her deposition could Meyer identify what, specifically, caused her fall. She testified that all she really remembers is falling forward: "There's only one thing I recall, and that's being thrust forward." (*Id.* at 102).

{¶ 29} It appears from Meyer's testimony that what precipitated her fall was her suitcase coming to an unexpected stop. Meyer admitted, though, that she did not see what it was that stopped the suitcase. She speculates that it was one of the suitcase wheels catching in a rut or divot, but she was unsure. She cannot point to a particular rut or crack as the culprit. The photos taken of the area in which she fell show cracks in the asphalt, some much smaller than others, but it cannot reasonably be inferred that a "substantial" rut or divot must have caused the suitcase to stop. *Compare Gibbs*, 2014-Ohio-3055, 15 N.E.3d 444, at ¶ 20-21 (rejecting the plaintiff's contention that the fact that he felt ruts of ice under his feet gave rise to an inference that he tripped over a rut of ice); *McLain*, 1996 WL 107513, *6-7 (saying that the plaintiff's testimony that her foot caught on something before she fell but had no idea what suggests contact with something before she fell but could be attributable to a number of causes, including a misstep).

{¶ 30} We have said that " '[t]o establish negligence in a slip and fall case, it is incumbent upon the plaintiff to identify or explain the reason for the fall. Where the plaintiff,

---

[3] Dayton's motions to strike targeted the hearsay in these reports. The trial court overruled the motions and considered the reports. Dayton did not cross-appeal the trial court's rulings on this issue.

either personally or by outside witnesses, cannot identify what caused the fall, a finding of negligence on the part of the defendant is precluded.'" *Harshaw v. Trotwood Foodtown, Inc.*, 2d Dist. Montgomery No. 15125, 1996 WL 74702, *1 (Jan. 24, 1996), quoting *Stamper v. Middletown Hosp. Assn.*, 65 Ohio App.3d 65, 68-69, 582 N.E.2d 1040 (12th Dist.1989). We hold that Meyer failed to develop sufficient facts from which a trier of fact could determine that a defect in the parking lot asphalt of sufficient size to impose liability was the particular cause of her fall and summary judgment is appropriate on the issue of proximate cause.

*Immunity*

**{¶ 31}** Dayton argued that it was also entitled to summary judgment because it is immune from liability under R.C. 2744, the Political Subdivision Tort Liability Act. The trial court agreed, finding that Dayton did not engage in negligent conduct and that the record does not indicate that Dayton acted badly or recklessly.

**{¶ 32}** A political subdivision is immune from tort liability incurred in performing a "governmental function" or a "proprietary function" unless a statutory exception applies and none of the statutory defenses applies. *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 7-9. A "proprietary function" includes "[t]he establishment, maintenance, and operation of * * * an airport," R.C. 2744.01(G)(2)(c), and "[t]he operation and control of a[n] * * * off-street parking facility," R.C. 2744.01(G)(2)(e). The maintenance of a city-owned parking lot is a proprietary function. *Bounds v. Marc Glassman, Inc.*, 8th Dist. Cuyahoga No. 90610, 2008-Ohio-5989, ¶ 14. Meyer says that Dayton did not run the parking lot but that a contracted company did.[4] This is immaterial.

---

[4] Dayton Airport Parking, LLC, a dismissed defendant, ran the parking lot.

Dayton owns and maintains the parking lot. That it chose to contract out day-to-day running of the lot does not mean that it does not operate or control it.

{¶ 33} Two of the statutory exceptions in R.C. 2744.02(B) are relevant here, but neither applies. The first exception is for injury "caused by the negligent performance of acts by [the political subdivision's] employees with respect to proprietary functions of the political subdivisions." R.C. 2744.02(B)(2). We have already concluded that exception does not apply in that Meyer has failed to show that Dayton was negligent. The second exception is for injury "caused by the negligence of [the political subdivision's] employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function." R.C. 2744.02(B)(4). In addition to Meyer's failure to show negligence, no governmental function is implicated here. Thus summary judgment is also proper on immunity grounds.

### III. Conclusion

{¶ 34} We have considered the other issues that Meyer raises in her brief and find none that merit consideration. Dayton is entitled to judgment as a matter of law on Meyer's claim for negligence. Therefore the sole assignment of error is overruled, and the trial court's judgment is affirmed.

. . . . . . . . . . . .

FAIN, J., concurs.

FROELICH, J., dissenting:

{¶ 35} A de novo review is this court's independent review of the evidence before

the trial court without any deference to the trial court's determination. I do not necessarily disagree with the majority's thorough review of the record which, by definition, is the same evidentiary material available to the attorneys and trial court. However, I would remand for the parties to argue and the court decide the motions based on the facts the de novo review has determined.

. . . . . . . . . .

Copies mailed to:

James R. Gallagher
Lawrence E. Barbiere
Robert S. Hiller
Jay D. Patton
John C. Musto
Hon. Barbara P. Gorman